**FIRST NATIONAL BANK OF WEBSTER, Plaintiff,**

v.

**AETNA CASUALTY AND SURETY COMPANY, Defendant.**

**Civ. A. No. 64–56.**

United States District Court
D. Massachusetts.

June 29, 1966.

John P. Dunn, Francis P. O'Connor, Vaughan, Esty, Crotty & Mason, Worcester, Mass., for plaintiff.

Richard Wait, Choate, Hall & Stewart, Boston, Mass., Elmer W. Beasley, Hartford, Conn., for defendant.

## OPINION

JULIAN, District Judge.

This case was tried by the Court sitting without a jury. On the basis of the evidence and the statement of agreed facts the Court finds as follows:

1. Plaintiff (also referred to as the Bank) is a national banking association organized and existing under the laws of the United States, with its principal place of business in Webster, County of Webster, Commonwealth of Massachusetts.[1]

1. Pursuant to an agreement of consolidation and reorganization between the plaintiff and the Guaranty Bank and Trust Company (a Massachusetts banking cor-

2. Defendant (also referred to as Aetna) is an insurance company organized and existing under the laws of the State of Connecticut, with its principal place of business in Hartford, Connecticut, and is duly authorized to transact business in Massachusetts.

3. The matter involved herein, exclusive of interest and costs, exceeds the sum of Ten Thousand Dollars.

4. At all times material hereto, including the calendar years 1956 through 1961, there was in full force and effect between the parties a bond called "Bankers Blanket Bond" whereby Aetna undertook and agreed "to indemnify and hold harmless First National Bank, Webster, Massachusetts * * * to an amount not exceeding $150,000 from and against any losses sustained and discovered as hereinafter set forth:

\* \* \* \* \* \*

"The losses covered by this bond are as follows:

"(A) Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of any of the Employees.

"(B) Any loss of Property through robbery, burglary, common-law or statutory larceny, theft, false pretenses, hold-up, misplacement, mysterious unexplainable disappearance, damage thereto or destruction thereof, whether effected with or without violence or with or without negligence on the part of any of the Employees. * * * "

The word "Property" is defined in the bond to mean "money" among other things.

5. During the calendar years 1956 to 1961 inclusive, Travel Master Shoemakers, Inc. (hereinafter called Travel Master), and its predecessor Sandler-

Fenton Shoemakers, Inc., were corporate customer-depositors of the plaintiff Bank, and did business in Webster, Massachusetts, under the firm name and style, Sandler-ette Footwear Mfg. Co. (hereinafter referred to as Sandler-ette). Travel Master Shoemakers, Inc., later changed its name to Sandler-ette Footwear Mfg. Corp., hereinafter also referred to as Sandler-ette.

6. From March 5, 1956, until November, 1961, Charles L. Morse was office manager of Sandler-ette. During that period Morse deposited in the Sandler-ette account or accounts at the plaintiff Bank certain checks received by Sandler-ette and made payable to it. He cashed checks, in amounts never exceeding three hundred dollars, drawn by Sandler-ette and made payable to cash or to petty cash, for Sandler-ette's business purposes. He cashed checks drawn by Sandler-ette and made payable to some of the Sandler-ette employees, including Edward W. Roberts, vice president of the parent corporation in charge of Sandler-ette. These were paychecks and were cashed regularly on Fridays. On some occasions he cashed checks drawn by Sandler-ette and made payable to Roberts, on days other than Fridays, for travel expenses in connection with Sandler-ette business. Most of these transactions were handled through Teller No. 1.

7. In addition to those checks presented to the plaintiff by Morse, as set forth in paragraph "6" herein, during the years 1956 to 1961 inclusive, Morse presented checks to the plaintiff aggregating approximately $310,000 and received cash in the full amount of said checks in return therefor. This cash was appropriated by Morse to his own use. These checks were generally presented to Tellers Nos. 1 and 2. Most of these checks were made payable to "Sandler-ette Footwear Mfg. Co.," but some were payable to "Sandler-ette" or to "Sandler-ette Footwear" or to "Sandler-ette Footwear

poration), consummated on September 30, 1965, all of the rights of the plaintiff against the defendant were assigned to the Guaranty Bank and Trust Compa-

ny, the continuing corporation. With the assent of the parties a motion was granted substituting Guaranty Bank and Trust Company as the plaintiff in this action.

Manufacturing Corp.," and each check bore one or the other of the following two stamped endorsements placed thereon by Charles L. Morse:

"Pay to the Order of
FIRST NATIONAL BANK
OF WEBSTER
Webster, Mass.
Sandler-ette
Footwear Mfg. Co."
or
"Pay to the Order of
FIRST NATIONAL BANK
OF WEBSTER
Webster, Mass.       .
Sandler-ette
Footwear Mfg. Corp."

and in each case the rubber-stamped endorsement was followed by the handwritten signature of Charles L. Morse. The first stamp was used after April 20, 1959, and the second prior to that date, in each case irrespective of the manner in which the payee was set forth on the check.

8. All of the checks which were made payable to Sandler-ette and which were deposited by Morse, as set forth in paragraph "6" herein, bore one or the other of the two stamped endorsements referred to in preceding paragraph "7". Any check which was cashed at the request of Morse bore the signature of Morse, for it was a rule of the Bank that anyone who wanted cash on a check was required to place his handwritten endorsement thereon.

9. One of the functions of Morse was to prepare checks, received by Sandler-ette and payable to Sandler-ette, for deposit. As a means of accomplishing this, Morse was authorized by Sandler-ette to place on all such checks the rubber-stamp endorsements referred to in paragraph "7" herein and to deliver all said checks to the plaintiff.

10. Checks which were not made payable to Sandler-ette did not bear either of the rubber-stamp endorsements referred to in paragraph "7" herein.

11. Although there were occasions when cash was paid out by the Bank to Morse without prior arrangement, more often the cash was paid out after a telephone call from Morse to the Bank, with the telephone call usually being taken by the Bank's receptionist, although occasionally the call would be taken by Teller No. 1. Morse would pick up this cash at the Bank after March 5, 1956. In connection with cashing the checks payable to Sandler-ette, to which reference is made in paragraph "7" herein, and in connection with cashing the checks to which reference is made in paragraph "6" herein payable to cash or to petty cash or to Edward W. Roberts, Morse would call the Bank and state that the cash was wanted in specified denominations of bills and currency. On some occasions he would state that the cash was wanted for various business purposes of Sandler-ette, which he would describe, and on other occasions there was nothing said about why the cash was wanted. In response to these calls, a teller, usually Teller No. 1, would place the requested cash in an envelope or envelopes with Sandler-ette's name and the amount of the contents thereon. When Morse came to the plaintiff to pick up cash, he would present a check, or several checks, and the check or checks would always total the exact amount of cash which had been previously requested. The teller would total the amount of the checks, if there was more than one, on her machine, to see whether the checks equalled the amount of cash which was noted on the envelope or envelopes, and when this was done the teller would give Morse the envelope containing the cash, with Sandler-ette's name written thereon, and he would take the cash away in the envelope or envelopes.

12. With reference to the calls Morse made to the Bank to arrange for the delivery to him of cash in return for the checks to which reference is made in paragraph "7" herein, it was Morse's intention when he made these calls to misappropriate this cash to his own use, and this was his intention when he went to the Bank and obtained the cash. When this cash was delivered to Morse, it was

the intention of the delivering teller or tellers to deliver the cash to Morse for the use and purposes of Sandler-ette, and the teller or tellers made the deliveries in reliance upon Morse's representations over the telephone to which reference is made in paragraph "11" herein.

13. The principal devices employed by Morse to conceal his misappropriations of the cash referred to in paragraph "7" herein were as follows: Sales invoices at Sandler-ette were prepared in duplicate or triplicate depending on the type of sale. The original copy of the invoice was mailed to customers and the copies which should have been retained as posting media to the sales book and accounts receivable ledger were destroyed so that there was no record ·of the sales and indebtedness from the customers in the general books. Upon receipt of a check in payment of such invoices the check was abstracted and cashed as herein set forth in paragraph "7". Also in many instances customers' checks received in payment of invoices properly recorded on the books were abstracted and cashed.

14. No person in authority at Sandler-ette or at Travel Master or at Sandler-Fenton Shoemakers, Inc., either orally or in writing, at any time material hereto, said in substance to Morse or to any teller or officer of the Bank that Morse had the duty or the right to cash checks made payable to Sandler-ette. I find that Morse had neither actual nor apparent authority to cash these checks. His authority was limited to depositing them at the Bank to the account of Sandler-ette.

15. At all times material hereto, when a check was cashed at the Bank it would have imprinted on it by the teller handling the particular transaction a stamp indicating that the check was cashed and by what teller. Checks that had been cashed would accumulate in the teller's cage and from time to time each day these would be picked up by employees in the Bank's proof department, and they would separate them according to the location of the drawees and route them for collection. Each teller would keep a record of the cash she started the day with, of the cash she took in during the course of a given day, of the total of the cash she paid out on checks, and of the cash she had at the end of the day. This record would go to the proof department for verification and then to the head teller.

16. Since some years prior to February, 1960, the two tellers to whom Morse presented most of the checks involved in this action had been informed by representatives of the Bank, and knew, that they were not authorized by the Bank to cash checks made payable to corporate payees without special authorization from an officer of the Bank. No such special authorization was given to cash checks payable to Sandler-ette.

17. The checks cashed for Morse as set forth in paragraph "7" herein were subsequently paid by the drawee banks and the face amounts remitted to the Bank. The Bank did not credit any account of Travel Master or its predecessor with these amounts.

18. It is agreed that the Bank has complied with the bond provisions relating to notice and proof of loss except that if the plaintiff was required thereby to furnish oral or written notice of proof of loss prior to November 29, 1961, no such notice or proof loss was furnished by the Bank to Aetna prior to that date.

19. Thereafter Travel Master commenced an action in the Worcester County Superior Court, Massachusetts (docket number 144365), against the Bank to recover the sums which it alleged were due it as a result of the facts hereinabove set forth. In the action brought by Travel Master, the writ, declaration and other pleadings were amended prior to trial by changing the name of Travel Master to "Sandler-ette Footwear Mfg. Corp."

20. On or about the date that the trial of said action, Worcester Superior Court No. 144365, began before an Auditor, the parties thereto filed in the court a stipulation containing several exhibits. Said stipulation is adopted by the parties hereto, and the parties hereto stipu-

late the facts recited therein. The following are facts contained in that stipulation which the Court deems material to the present case:

a) Each of the checks [involved in this action] was complete and regular on its face.

b) There was and is no written authorization for Charles L. Morse to sign, cash, or endorse checks made payable to Sandler-ette, nor was one ever requested by the Bank or offered by Sandler-ette.

c) On December 1, 1961, Sandler-ette commenced an equity proceeding against the said Charles L. Morse, his wife, Barbara Morse, and L & M Enterprises, Inc., in the Superior Court for Worcester County. A copy of the Bill of Complaint in said action, numbered in said Worcester County Superior Court 142041 is annexed hereto as Exhibit "E" and made a part hereof. On February 16, 1962 a final decree in said equity action was entered by the court and assented to by the interested parties. A copy of that final decree is hereto annexed marked Exhibit "F" and made a part hereof. Thereafter, pursuant to the said final decree, the defendants in said equity action, Charles L. Morse and Barbara Morse, complied in all respects with the order of the court contained in paragraphs two and three of said final decree.

d) On March 26, 1962 an involuntary petition in bankruptcy was filed against L & M Enterprises, Inc. Thereafter a stipulation relative to the claim of Travel Master Shoemakers, Inc. and a petition on the part of the trustee in bankruptcy of L & M Enterprises, Inc. to compromise the claims of Sandler-ette in the bankruptcy proceedings was filed with the District Court of the United States for the District of Massachusetts in bankruptcy and assented to by Sandler-ette. A copy of such stipulation and a copy of such petition to compromise is annexed hereto as Exhibit "G" and made a part hereof. Thereafter on September 13, 1962, in said bankruptcy proceedings, the Referee in Bankruptcy entered an order authorizing the compromise of the claim of Sandler-ette pursuant to said petition.

e) On January 10, 1962, Morse was indicted for larceny as a result of his activities in connection with some of the aforesaid 172 checks, and others involving another bank. Copies of the docket entries with respect to the indictments and the dispositions thereof are attached hereto as Exhibits "H", "I", and "J". On June 27, 1962, after hearing before the court, and after pleas of guilty, Morse was sentenced as indicated in the said Exhibits "H", "I", and "J".

It is unnecessary to quote here the exhibits attached to the stipulation filed in the Superior Court case.

21. Between November, 1961, and the date of the institution of the action in the Worcester Superior Court, Docket No. 144365, representatives of Aetna attended meetings and negotiations with representatives of Sandler-ette and of the Bank, and while said suit was pending counsel for the Bank and for Aetna consulted on numerous occasions with respect to the conduct of the litigation.

22. Defense of said action, Worcester County Superior Court Docket No. 144365, was tendered by the Bank to Aetna, but it was refused by Aetna.

23. During the course of trial of said action, Worcester Superior Court Docket No. 144365, before an Auditor in the Worcester Superior Court, counsel for the Bank and counsel for Aetna consulted on many occasions concerning settlement of that action. Following these consultations, counsel for Aetna delivered to counsel for the Bank a letter which reads as follows:

"Your client, the First National Bank of Webster, has been sued by Sandler-ette Footwear Manufacturing Corp. on a claim relating to the cashing of cheques which is set out in the several counts of the declaration in that action, which is docket number

144365 in Worcester Superior Court. A stipulation was filed in that action setting forth certain facts relative to the claim and some testimony has been taken before an Auditor. You now propose to settle that action through payment of $130,000. Aetna Casualty and Surety Company has an interest in the matter since it issued to your client its surety bonds numbered 6F4366, 6F5641, and 12F37, and it is your position that the loss to your client through the claim of Sandler-ette is within the coverage of one or more of said bonds. I am authorized on behalf of Aetna to agree that the proposed settlement is prudent and reasonable on the basis of the Sandler-ette case as it now stands on the record.

"In the event that you conclude the proposed settlement and close the action through the entry of an agreement for neither party and that thereafter First National Bank of Webster brings suit against Aetna Casualty and Surety Company upon a bond or bonds, Aetna will not in that action take the position that the settlement was not fair, reasonable, bona fide, or prudent and further agrees that you may treat the neither party agreement as the equivalent of a judgment of the Superior Court of Worcester County for the plaintiff Sandler-ette entered after a full trial of said action docket number 144365.

"It is understood that Aetna reserves all rights with reference to whether or not any loss claimed by the Bank is within the coverage of any of the bonds to which I have referred."

The letter is signed by counsel for Aetna. Thereafter, said action was settled for $130,000 and the action was terminated by the filing of an agreement for judgment for neither party.

24. On June 3, 1963, the Bank paid the sum of $130,000 to Sandler-ette Footwear Mfg. Corp.

25. The Bank incurred costs and attorneys' fees in the amount of $8,725 in defending the action brought against it by Sandler-ette, Worcester Superior Court Docket No. 144365. No question is raised by Aetna as to the fairness and reasonableness of said fees and costs.

26. The parties have agreed that the sole issue to be decided by the Court is whether the loss suffered and the money expended by the Bank are within the coverage of the bond.

27. The parties have also agreed that if the Court decides the issue in favor of the Bank, the Bank is entitled to recover $138,725 plus interest at the legal rate from June 3, 1963, and its costs herein. If the Court finds for Aetna with respect to the issue above set forth, Aetna shall be entitled to its costs.

The plaintiff has failed to prove that its loss was caused by any dishonest, fraudulent or criminal act of any of its employees committed anywhere either alone or in collusion with Morse or any other person. The loss, therefore, is not covered by clause A of the bond. Accordingly, I hold that the plaintiff is not entitled to recover under clause A.

I hold, however, that the plaintiff is entitled to recover under clause B of the bond.

The plaintiff sustained a loss of money through statutory larceny as defined in the General Laws of Massachusetts.

In the case of Commonwealth v. Barry, 1878, 124 Mass. 325, 327, the Supreme Judicial Court of Massachusetts stated the common law as follows:

"If the possession of * * * property is obtained by fraud, and the owner of it intends to part with his title as well as his possession, the offence is that of obtaining property by false pretences, provided the means by which they are acquired are such as, in law, are false pretences. If the possession is fraudulently obtained, with intent on the part of the person obtaining it, at the time he receives it, to convert the same to his own use, and the person parting with it intends to part with his possession merely, and

not with his title to the property, the offence is larceny."

Statutory larceny is defined in Mass.G.L. c. 266, § 30 as being committed when one "steals, or with intent to defraud obtains by a false pretence * * * the property of another * * *." The word "steal" as used in section 30 is a term of art and encompasses "[t]he criminal taking, obtaining, or converting of personal property with intent to defraud or deprive the owner permanently of the use of it; including all forms of larceny, criminal embezzlement, and obtaining by criminal false pretences." Commonwealth v. Kelley, 1903, 184 Mass. 320, 323, 68 N.E. 346, 347. It appears, then, that regardless of whether the Bank surrendered title or merely possession of the money when the bank teller handed it over to Morse, if the Bank suffered a loss of the money at that time because of false pretenses on the part of Morse, the loss is covered by clause B of the bond, at least under the term "statutory larceny."

■ The relationship between a commercial bank and a general depositor (Sandler-ette here) is that of debtor and creditor, Bachrach v. Commissioner of Banks, 1921, 239 Mass. 272, 273, 131 N.E. 857, and therefore when the Bank gave cash to Morse for a check, it was giving its own money.[2]

■■ I find that Morse obtained the Bank's money by false pretenses. The Supreme Judicial Court has stated that "[t]o constitute the crime of larceny by false pretenses (G.L. c. 266, § 30), it must appear that there was a false statement of fact known or believed by the defendant to be false made with the intent that the person to whom it was made should rely upon its truth and that such person did rely upon it as true and parted with personal property as a result of such reliance." Commonwealth v. Louis Construction Co., 1962, 343 Mass. 600, 604, 180 N.E.2d 83, 86. According to

Mass.G.L. c. 277, § 39, false pretenses can be made by acts as well as words. They may in fact be made in any of the ways in which ideas may be communicated. Commonwealth v. Morrison, 1925, 252 Mass. 116, 122, 147 N.E. 588. A misrepresentation as to a person's present intention may be a false pretense. Commonwealth v. Walker, 1871, 108 Mass. 309, 312.

I find that in cashing the checks involved in this case, Morse, with intent to defraud, falsely represented to the tellers of the plaintiff that he was acting for Sandler-ette and that he intended to receive the money as agent for Sandler-ette and apply it to Sandler-ette's interests. These representations were made by Morse in some cases by telephone calls and in other cases by his actions in presenting the checks to the teller ostensibly in his known capacity as office manager of Sandler-ette. The representations were in fact false, since Morse's intention at the time of making them was to appropriate the money to be received to his own uses. (See paragraph 12 of the facts stipulated above.) Morse knew that the representations were false when he made them, and he intended that the employees of the Bank would rely upon them. The employees did rely upon them and as a result handed the money of the Bank over to Morse.

■ I find that the loss occurred at the time the Bank paid its own money to Morse in exchange for the checks involved. It is true that the face amounts of the checks received from Morse were subsequently remitted to the plaintiff by the drawee banks, and that thereafter Sandler-ette brought action in Worcester Superior Court to recover the amounts of these remittances. The plaintiff settled the claim by paying to Sandler-ette the exact amount in issue here, and the defendant has stated that the settlement was "prudent and reasonable on the basis of the Sandler-ette case as it now stands

---

2. The defendant in effect concedes this in its brief (p. 32): "The bank never at any time had money in its hands belonging to Sandler-ette. Sandler-ette was a depositor at plaintiff but the relationship of creditor and debtor existed between them."

on the record." (See letter referred to in paragraph 23 of the stipulation and quoted above.) I find, however, that the loss occurred at the time of initial payment to Morse because of his false pretenses rather than at the time of payment to Sandler-ette of the amount of settlement.

In the case of Eliot Savings Bank v. Aetna Casualty & Surety Co., 1941, 310 Mass. 355, 38 N.E.2d 59, a forger obtained a loan of $500 from the bank in return for a forged promissory note and power of attorney transferring certain stock to the bank, both purporting to be in the name of the true owner of the stock, a Mr. O'Brien. This occurred on November 15, 1923. Subsequently, in 1932, when the loan was not paid on maturity, the bank caused the stock to be sold in payment of the loan and guaranteed the forged signature of O'Brien. In 1937 O'Brien brought suit against the company issuing the stock and received a decree ordering the company to replace the stock that had been wrongfully pledged with the bank by the forger. The company in turn sued the bank on its guaranty of the forged power of attorney and recovered the amount it had been compelled to expend. The bank then brought suit on a bankers' blanket bond executed by Aetna covering losses to the bank occasioned by forgeries. The question to be decided by the Supreme Judicial Court was whether the loss occurred at the time the bank gave its money to the forger in return for forged instruments, or at the later time when the bank was forced to give up the money it had recouped on the sale of the collateral. The Court held that the time when the actual loss occurred was when the money was paid out to the forger.[3]

I find, therefore, that the plaintiff suffered a loss when it delivered its own money to Morse.

[6] I find that the loss was caused by Morse's obtaining the money from the Bank through false pretenses. I rule that the loss falls within the coverage of clause B of the bond. Under that clause it is immaterial that negligence on the part of the Bank's employees contributed to the success of Morse's scheme.

On the issue of notice, the bond provides that "at the earliest practicable moment after discovery of any loss hereunder the Insured shall give the Underwriter written notice thereof. * * *" It is stipulated that the "plaintiff has complied with the bond provisions relating to notice and proof of loss except that if the plaintiff was required thereby to furnish oral or written notice or proof of loss prior to November 29, 1961, no such notice or proof of loss was furnished by the plaintiff to the defendant prior to that date."

I find that the Bank first learned of Morse's unlawful conduct on November 28, 1961, upon receipt of a telephone call from Sandler-ette, which had itself just learned of the facts. As stated in Aetna's brief (p. 15), the claim of Sandler-ette first came to light on November 29, 1961, when Sandler-ette, by letter bearing the same date, made demand on the plaintiff for return of the money which the Bank had paid to Morse. I find that this latter date was the time of "discovery" of a "loss" to the Bank within the meaning of the bond. I further find that the earliest practicable date that the Bank could have given oral or written notice of loss or furnished proof of loss to Aetna was on or after November 29, 1961. In the circumstances of this

3. A similar finding was made in a case involving indemnity under a bond for a loss occasioned to the bank by the forging of checks. Phoenix National Bank & Trust Co. of Lexington v. Aetna Casualty & Surety Co., 1930, 6 Cir., 44 F. 2d 511. Although the case was overruled on other grounds by the Supreme Court in 285 U.S. 209, 52 S.Ct. 329, 76 L.Ed.

709, the Supreme Court noted that "we assume, as the court below held, that petitioner's [Aetna] liability attached on payment of the checks, and that respondent [bank] had none the less suffered a loss even though it might be able to recoup it from others * * *." Id. at 214, 52 S.Ct. at 331.

case the Bank was not required by the provisions of the bond to give notice or furnish proof of loss prior to November 29, 1961.

The defendant attempts in three ways to bind the plaintiff to a determination that the money taken by Morse belonged to Sandler-ette rather than the plaintiff. I shall discuss each separately.

First, the defendant alleges that this fact was established in three prior actions: an action in equity in Worcester Superior Court by Sandler-ette against Morse, his wife, and L & M Enterprises, a bankruptcy proceeding involving L & M Enterprises in which Sandler-ette asserted a claim, and a criminal action by the Commonwealth against Morse in Worcester Superior Court. The defendant argues that the alleged determinations in these actions are *res judicata* against the plaintiff Bank in this action. The complete answer to this argument is that the plaintiff Bank was in no way a party to any of these actions, and therefore the doctrine of *res judicata* is inapplicable. The cases cited by the defendant are not in point since in each cited case the party to be bound by a decision in a prior action was actually a party or privy to a party in that prior action. This is not the case here. It is unnecessary, therefore, to determine whether or not the decisions in the equity, bankruptcy and criminal actions are actually inconsistent with the position of the plaintiff here.

Secondly, the defendant proffers an interpretation of the stipulation of facts entered into by the parties in this case which does not comport with the wording of the stipulation and which the plaintiff contests. Paragraph 20 of the stipulation states that the parties to the suit between Sandler-ette and the Bank in Worcester Superior Court entered into a stipulation containing several exhibits in that action, and that "said stipulation is adopted by the parties hereto, and the parties hereto stipulate the facts recited therein." The defendant contends that the plaintiff has thereby accepted as proved all the facts stated in the *exhibits* to the Superior Court stipulation as well as the Superior Court stipulation itself. Those exhibits consist of the bill of complaint in the Worcester Superior Court equity action between Sandler-ette and Morse, his wife and L & M Enterprises (Exh. E), the final decree in that action (Exh. F), the stipulation between Sandler-ette and L & M Enterprises in the bankruptcy action, and the trustee's petition to compromise the secured claims of Sandler-ette (Exh. G), and, finally, the docket entries in the criminal action of Commonwealth v. Morse (Exh. H). The defendant attempts to argue from facts stated in these exhibits that the plaintiff has agreed that the money stolen belonged to Sandler-ette and not to the Bank.

I find that the parties herein agreed to accept as proved the *facts* stated in the stipulation in the action brought by Sandler-ette against the Bank, but agreed only to the existence and authenticity of the exhibits attached thereto. This comports with the plain meaning of the words. The Sandler-ette-Bank stipulation states as follows: "A copy of the Bill of Complaint [in the equity action] * * * is annexed hereto as exhibit 'E' and made a part hereof." This wording indicates that Sandler-ette and the Bank agreed that exhibit "E" was a true copy of the actual complaint in the equity action but not that every allegation stated in that complaint was in fact true. The same applies to exhibits "F" and "G" identified above. When, therefore, the parties to this action (Aetna and Bank) agreed to adopt the stipulation between the Bank and Sandler-ette with its exhibits, they went no further in adopting the exhibits as statements of established facts than Sandler-ette and the Bank had earlier.

Furthermore, whatever interest as against Morse, Sandler-ette may have acquired in the money *after* the Bank had paid it to Morse, the fact remains that at the time the Bank delivered it to Morse in reliance on his false representations, the money belonged to the Bank, and the ultimate loss remained with the Bank.

The defendant raises one final argument which is based on the agreement between the parties that the plaintiff may treat the neither-party agreement as the equivalent of a judgment of the Superior Court of Worcester for Sandler-ette entered after a full trial. (See letter from Aetna to the Bank quoted above.) The defendant attempts to raise what is essentially an agreement not to plead a particular defense [4] to the level of an agreement, binding on the Court, that the Sandler-ette settlement shall have the legal effect of an actual judgment after trial. Based on this premise, the defendant dissects the declaration in the Sandler-ette action count by count to show that a judgment after trial could not be obtained without a finding in some way detrimental to the plaintiff's position in this case.

The argument is fallacious in that it depends upon the power of the parties by agreement to compel the Court to give to a settlement in another action the legal effect of a judgment after trial. While an actual judgment would lend itself to such technical scrutiny, a settlement between parties would not, since the latter is subject to undetermined extra-legal as well as legal influences (as defendant recognizes in its brief at page 40). A settlement is not a conclusive ruling on legal issues which can be analyzed;[5] it is rather an accommodation of the financial differences of the parties without proceeding to such a ruling. The power to bind the Court to consider a settlement as the equivalent of a judgment does not lie in the parties. "[T]he Court is not controlled or bound by the agreement of counsel on a question of law," American Chemical Paint Co. v. Dow Chemical Co., 1947, 6 Cir., 164 F.2d 208, 209, and the legal effect to be given the prior settlement is a matter of law. The argument therefore collapses with its basic premise; and it is unnecessary to consider the further questions of whether the defendant has correctly interpreted the extent of the agreement, and whether in fact the conclusions it draws from its analysis of the declaration are sound.

Since the case was not tried to a conclusion, but was terminated by the entry of a judgment for neither party, none of the specific issues raised by the pleadings was adjudicated. All that can be said with certainty is that all claims that may have accrued to Sandler-ette against the Bank as a result of the Bank's delivery of the money to Morse and the subsequent retention by the Bank of the proceeds of the checks, were extinguished by the judgment for neither party and the payment of $130,000 by the Bank to Sandler-ette.

Treating the neither-party agreement as the equivalent of a judgment for Sandler-ette has no other material significance than to establish that the Bank paid the $130,000 to Sandler-ette, not on a voluntary basis but as a matter of legal obligation.

The loss suffered by the plaintiff and the costs and attorney's fees incurred in defending the Sandler-ette action are within the coverage of the bond. I therefore find for the plaintiff in the amount of $138,725 plus interest at the legal rate from June 3, 1963, and its costs herein.

---

4. The context of the Aetna letter quoted above indicates that the purpose of the agreement was to insure that the defendant would not raise the defense in this action that the plaintiff ultimately suffered a voluntary loss in settling its action with Sandler-ette, or a loss which was unreasonable or unwarranted by its legal position.

5. Defendant in its brief, p. 31, appears to agree with this view:
"The agreement for neither party in the action between Sandler-ette and the bank was a final disposition of that action, but it is not an adjudication of the merits of that action."