The AETNA CASUALTY AND SURETY COMPANY, Defendant, Appellant,

v.

GUARANTY BANK AND TRUST COMPANY, Plaintiff, Appellee.

No. 6797.

United States Court of Appeals
First Circuit.

Heard Nov. 9, 1966.

Decided Dec. 20, 1966.

Richard Wait, Boston, Mass., and Elmer W. Beasley, Hartford, Conn., with whom Choate, Hall & Stewart, Boston, Mass., was on brief, for appellant.

Francis P. O'Connor, Worcester, Mass., with whom John P. Dunn, Worcester, Mass., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

## OPINION OF THE COURT.

McENTEE, Circuit Judge.

The sole issue raised by this appeal is whether a loss suffered by plaintiff bank is within the coverage of a Bankers Blanket Bond[1] which was in full force and effect between the bank and the defendant, Aetna, at the time the loss occurred. The trial court, sitting without a jury, found that the loss in question was within the coverage of the bond[2] and entered judgment for plaintiff.[3] Defendant's appeal followed. The court's findings are based for the most part on a statement of agreed facts filed by the parties.

Plaintiff's loss resulted from the peculations of one Morse who from 1956 until November 1961 was office manager of a Webster, Massachusetts firm known as Sandler-ette. This firm was a customer of the bank. One of Morse's duties as office manager was to prepare for deposit checks received by and made payable to the company. This entailed placing a rubber stamp endorsement on all such checks and delivering them to the bank for deposit, which he had authority to do. During the period above mentioned, Morse wrongfully cashed 172 of these checks, totalling some $310,000, and misappropriated the money to his own use. These checks were cashed by plaintiff bank and the money delivered to Morse over the counter, in exchange for the checks.[4]

The parties have agreed that when Morse telephoned the bank to arrange for delivery of the cash in exchange for the checks, wrongfully cashed, it was his intention to misappropriate this cash to his own use; that this was his intention when he went to the bank and obtained

1. Originally this bond ran to the First National Bank of Webster, the original plaintiff in this case. Subsequently, all the rights of that bank were assigned to Guaranty Bank and Trust Company under a consolidation and the latter named Bank was substituted as plaintiff.

2. See district court's opinion, First National Bank of Webster v. Aetna Casualty & Sur. Co., 256 F.Supp. 266 (D.Mass. 1966).

3. This judgment was for $138,725, plus interest. It was agreed by the parties that if the court decided for plaintiff it would be entitled to recover the amount of its loss ($130,000), plus $8,725 for expenses incurred in defending a prior suit arising out of this loss, plus interest. The prior litigation is discussed later on in this opinion.

4. During this period Morse cashed other checks at the bank but these were drawn by Sandler-ette and made payable to cash, petty cash or to named employees. They never exceeded $300. None of these checks are involved in this case. Although there were occasions when the bank paid out cash to Morse without prior arrangement, more often the cash was paid out

after a telephone call from Morse to the bank. With reference to the smaller checks, above mentioned and also the checks which Morse wrongfully cashed, he would call the bank and state the amount of cash wanted and the specific denominations. On some occasions he would state that the cash was wanted for various company purposes which he described but on other occasions he said nothing as to why it was wanted. The teller would then place the requested cash in envelopes with Sandler-ette's name on them and notations of the amounts therein. When Morse came for the cash he would present a check or checks in the exact amount of the cash previously requested. These checks were totalled to see that they equalled the amount of cash in the envelopes. When this was done the envelopes were delivered to Morse.

On the 172 checks wrongfully cashed, Morse signed his name (below the rubber stamp endorsement) as required by rule of the bank when cash is paid out on checks payable to corporate payees. It should be noted that Morse had no written authorization to sign, cash, or to endorse checks made payable to Sandler-ette except for deposit.

the cash; also that when this cash was delivered to Morse it was the intention of the teller or tellers to deliver it to him for the use and purposes of Sandler-ette and that the teller or tellers made these deliveries of cash to Morse in reliance upon his representations over the telephone. It was further agreed that no one connected with Sandler-ette ever told any officer or teller of the bank that Morse had the right or duty to cash checks made payable to this company. Also that the two tellers who cashed most of these checks[5] had been told by the bank and knew that they were not authorized to cash checks payable to corporate payees without special authorization from an officer of the bank.

Sandler-ette first learned of its office manager's nefarious actions on November 28, 1961,[6] and on that date alerted the bank. The next day (November 29), although not yet aware of the extent of the misappropriations, Sandler-ette made formal demand upon the bank for the amounts it had paid Morse in exchange for these checks. The bank, in turn, gave Aetna formal notice of claim by letter dated December 8, 1961.

Sandler-ette lost no time in proceeding against Morse. Immediately, it brought a bill in equity against him, his wife and a corporation owned by them to trace the stolen money.[7] As a result of the final decree entered in that case, certain assets standing in the name of this corporation were transferred to Sandler-ette. Subsequently, the corporation went into bankruptcy and Sandler-ette realized on these assets in that proceeding. Thereafter, at the instance of his former employer, Morse was indicted and later pleaded guilty to charges of larceny.[8]

The bank not having complied with the above mentioned demand for payment, Sandler-ette brought suit against it[9] to recover the proceeds of the checks it claimed the bank wrongfully paid to Morse. The parties in that case entered into a stipulation in which they incorporated as exhibits the pertinent documents in the three actions above mentioned.[10] This stipulation, together with said exhibits, by agreement of the parties is now part of the record in the instant case.

With this background, we now focus our attention on defendant Aetna's activities, particularly with reference to the Sandler-ette claim against the bank. The record indicates that with reference to this claim, Aetna was much more than a by-stander and had a real stake in the outcome of the litigation that fol-

---

5. Only seven of these checks were cashed by a third teller—not included in the stipulation.

6. Of course none of the checks in question went through Sandler-ette's account. They were processed by the bank and routed to the drawee banks for payment. Upon payment by the drawee bank, plaintiff bank did not credit Sandler-ette's account. When the company billed a customer for merchandise sold, the original invoice was sent to the customer and copies were kept by the company for its records. Morse had access to these records and in most instances destroyed all copies of invoices in the case of customers whose checks he wrongfully cashed. Thus the company had no record of such invoices and in this way Morse was able to avoid detection for as long as he did.

7. Morse had spent a large part of the stolen money in the construction of a bowling alley complex through his alter-ego—the corporation. Some of it was spent on a house in which he and his wife lived.

8. The decree, order and judgments of conviction, as the case may be, entered in all three of these actions were founded on the proposition that the money stolen by Morse was Sandler-ette's money.

9. This suit was brought in the Superior Court of Massachusetts for Worcester County.

10. These included the bill of complaint and final decree in the equity case; a certain stipulation, order and petition in the bankruptcy proceeding and the records of the proceedings in the criminal cases against Morse.

lowed.[11] During the trial the bank notified Aetna that it could settle Sandler-ette's case for $130,000.[12] Shortly thereafter the case was settled for that amount and a neither party agreement was filed in court. The bank then demanded indemnity against the payment of this settlement, plus counsel fees and expenses incurred in defending the Sandler-ette suit.[13] Aetna refused to pay and thereupon the instant suit was commenced.

For the purposes of this case, the losses covered by defendant Aetna's bond are as follows:

"(B) Any loss of Property [the term 'property' includes money] through robbery, burglary, common-law or statutory larceny, theft, false pretenses, holdup, misplacement, mysterious unexplainable disappearance, damage thereto or destruction thereof, whether effected with or without violence or with or without negligence on the part of any of the Employees. * * * "

Basically, the question of coverage of the bank's loss in this case depends upon our determination of whose money was stolen.[14]

■ Aetna contends (1) that the money stolen by Morse was Sandler-ette's money—not the bank's and (2) that in any event the bank did not comply with the notice or proof of loss requirements of the bond, both of which are conditions precedent to recovery. Its principal argument in support of the first contention is that the decree entered in the above-mentioned equity suit, the order in the bankruptcy proceedings and the judgments of conviction judicially established that the money stolen by Morse belonged to Sandler-ette. From this Aetna concludes that the determinations made in these three actions were conclusive against the bank not only in the Sandler-ette suit but also in the instant suit. The short answer to this argument is that the plaintiff bank here was not a party nor was it privy to a party in any of these prior proceedings (nor was Aetna) and, therefore, is not bound by them.

■ Aetna attempts in still another way to establish that the money stolen belonged to Sandler-ette. It advances the argument that when the parties in the instant case adopted the stipulation, entered into in the suit between Sandler-ette and the bank, the facts stated in the exhibits [15] attached to that stipulation were also accepted as proved—therefore the bank agreed that the money stolen belonged to Sandler-ette. From a mere reading of the stipulation it is plain that although the parties thereto agreed to accept as proved the facts stated in the stipulation, they agreed only to the existence and the authenticity of these exhibits, i. e., that they were true copies of the original documents. Thus, when the

---

11. Prior to the filing of Sandler-ette's suit against the bank, Aetna attended numerous meetings with these parties. While that suit was pending the bank and Aetna conferred frequently regarding the conduct of the litigation. The bank tendered Aetna the defense of the suit but it refused to accept it. Also at numerous times during the trial the bank discussed settlement of the case with Aetna.

12. In reply, Aetna wrote the bank that in the event the bank concluded this proposed settlement and then sued Aetna on its indemnity bond, Aetna in that suit would not take the position that this proposed settlement was not fair, reasonable, bona fide or prudent and further agreed that the bank may treat the neither party agreement executed in settlement of the case as the equivalent of a judgment for plaintiff in the Massachusetts Superior Court entered after a full trial. Aetna reserved its rights, however, on whether any loss claimed by the bank was covered by its bond.

13. Aetna's bond also indemnified the bank against the payment of court costs, and reasonable attorney's fees incurred in defending any suit against the bank arising out of any loss covered by the bond. The reasonableness of these expenses is not questioned in this case.

14. If the money stolen was Sandler-ette's, the loss does not come within the coverage of this bond.

15. See footnote 10.

bank and Aetna adopted that stipulation they went no further than did the parties in the earlier case.

Aetna argues that Sandler-ette ratified Morse's unauthorized acceptance of the cash as a matter of law (1) by causing him to be prosecuted for larceny of its property and (2) by proceeding in equity to trace its misappropriated funds. Aetna maintains that by so doing. Sandler-ette treated the bank's payments to Morse as payments to itself. From this it concludes that Sandler-ette was the owner of the proceeds of these checks and that the bank is thereby precluded from showing in this action that Morse stole its money.

■■ This argument appears to be predicated upon the theory that Sandler-ette received some benefit by taking the action it did to have Morse prosecuted for larceny of its property. It is difficult to see how Sandler-ette in doing this received or accepted the kind of tangible benefit recognized for ratification purposes under Massachusetts law. Restatement, Agency 2d; Mass.Annot. § 98; Cambridgeport Sav. Bank v. City of Boston, 297 Mass. 309, 8 N.E.2d 790, 792 (1937); Accord, Kidder v. Greenman, 283 Mass. 601, 187 N.E. 42, 49, 88 A.L.R. 1370 (1933). Nor does Sandler-ette's above-mentioned tracing action amount to a ratification as a matter of law. This suit is equally consistent with the theory that Morse gained possession of the checks in question by reason of his fiduciary relationship with his employer; that he wrongfully converted these checks to his own use, thus making him a trustee *ex maleficio* of the proceeds thereof for the benefit of Sandler-ette. Bresnihan v. Sheehan, 125 Mass. 11 (1878); cf. Berenson v. Nirenstein, 326 Mass. 285, 93 N.E.2d 610, 20 A.L.R.2d 1136 (1950). Since the final decree entered in that case recites only that Morse is indebted to Sandler-ette, we have no basis for inferring that any theory of recovery other than that above stated was relied upon.

■ We are not impressed by Aetna's further argument that the bank suffered no loss until it paid the $130,000 to Sandler-ette; that this being a judicially imposed liability, it is not a loss within the coverage of the bond. Clearly, every time Morse wrongfully cashed his employer's checks, the bank paid out *its* money to him over the counter and thereby suffered a loss at that time. Eliot Savings Bank v. Aetna Casualty & Surety Co., 310 Mass. 355, 38 N.E.2d 59 (1941). The $130,000 settlement merely determined the total amount of the bank's loss, sustained by reason of Morse's earlier defalcations.

The notice provisions of the bond read as follows: "At the earliest practicable moment after *discovery* of any loss hereunder the Insured shall give the Underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars." (Emphasis ours) With reference to the notice question, the parties agree that the bank " * * * has complied with the bond provisions relating to notice and proof of loss except that if the plaintiff [bank] was required thereby to furnish oral or written notice of proof of loss prior to November 29, 1961, no such notice or proof of loss was furnished by the plaintiff [bank] to the defendant [Aetna] prior to that date."

■ In our opinion the bank was not required to give notice or furnish proof of loss to Aetna prior to November 29, 1961. It learned of Morse's unlawful conduct on November 28, 1961, upon receipt of a telephone call from Sandler-ette. As far as the bank is concerned, the time of discovery of a loss, within the meaning of the bond, was the next day (November 29) when the bank first received a written demand for payment from Sandler-ette.[16] Therefore the earliest practicable time the bank could have given Aetna any notice or proof of loss

16. This demand was made by letter dated November 29, 1961, sent by certified mail —return receipt requested and presumably was received by the bank on that date.

was on that date. We, therefore, reject Aetna's contention that the bank did not comply with the notice requirements of the bond.

All other points raised have been considered and found to be without merit.

Affirmed.