## RUSSELL GASKET COMPANY, Plaintiff-Appellee,

v.

## The PHOENIX OF HARTFORD INSURANCE COMPANY, Defendant-Appellant.

### No. 74–1555.

United States Court of Appeals, Sixth Circuit.

Feb. 28, 1975.

John E. Martindale, Arter & Hadden, Cleveland, Ohio, for defendant-appellant.

Hahn, Loeser, Freedheim, Dean & Wellman, Forrest B. Weinberg, Neil K. Evans, Cleveland, Ohio, for plaintiff-appellee.

Before PHILLIPS, Chief Judge, ENGEL, Circuit Judge, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

Russell Gasket Company is a corporation in Ohio, engaged in the manufacture of nonmetallic gaskets and washers out of various flexible materials—cork, rubber, plastics, and the like. In the manufacture are used punch presses, book presses, and frame presses, and with this equipment are made valve-cover gaskets and oil-pan gaskets, and similar articles. The Company has hundreds of suppliers and its primary customers are those engaged in the automotive industry. Much of its business depends on information which it keeps confidential—as to what material sources were used for particular customers; who such customers were, and much other valuable information which the Company had gathered and was esteemed highly valuable in its business and, accordingly, kept confidential.

The Russell Gasket Company appears, since 1951, to be a successful, flourishing company of which Robert S. Stone was President, and the holder of 58 per cent of the stock.

In 1963, Mr. Stone hired Ed Grass as General Manager of the Company, and a contract was entered into in which Grass agreed that any confidential information, trade secrets, or improvements, unique to the Company's operation, whether or not Grass took part in, or was the sole developer thereof, "are the property of the Company, to be held by him in trust and solely for the Company's benefit, and the same shall not be

used or disclosed to others, either during or after his employment without the Company's written consent, unless the said confidential information, trade secrets, * * * become public knowledge through no fault of the employee."

As mentioned, Ed Grass started as General Manager of the Russell Gasket Company in 1963. He was fired on September 18, 1970, when it was discovered that he had been violating every provision of his contract with the Russell Company. This was found out when Mr. Edward Hammond called Mr. Stone and told him a man in Russell's employ owned 40 per cent of the stock in the R.P.I. Company, a smaller gasket company, and that he had recently received dividends of $12,000.00 from the R.P.I. Company. Mr. Stone immediately made an appointment with Mr. Hammond, who told him in the presence of Russell's counsel that the man who had received the dividends from R.P.I. was Ed Grass, who had given R.P.I. all sorts of records of the Russell Company and quotes prepared by him, as well as many documents stolen from the Russell Company, together with lists of sources of raw materials and lists of customers.

Mr. Hammond told Mr. Stone he would take him into the R.P.I. plant at night, where Mr. Stone found much of the Russell Company's property, consisting of dies of various kinds, of punch-press type dies, tool-ruled dies, and compound dies. Russell afterward received from Hammond many other documents, quotations, purchase orders that belonged to Russell and were stolen by Ed Grass, and given to R.P.I.

Shortly after the discovery of the frauds, embezzlements, and defalcations, on September 23, 1970, Mr. Stone, in writing, notified his insurance agent and representative of The Phoenix Insurance Company of the defalcations and the legal action the Russell Company had taken. Of course, at that time—thirteen days after Mr. Stone first was told that the thievery and fraud were going on— the Russell Company had no idea of the extent of the loss. There had been insufficient time to do more than ascertain the principal acts of defalcation and to speculate on the possible extent of the loss.

A year and a half later, on March 20, 1972, after extensive investigations and legal proceedings, Russell Gasket Company was awarded judgment against the original tortfeasors, Grass, one Freebairn, and the R.P.I. Company, in the Common Pleas Court of Cuyahoga County. Russell had been insured by The Phoenix of Hartford Insurance Company against losses arising from employee fraud and dishonesty under fidelity bonds issued by Phoenix which afforded coverage of $50,000 against such losses.

Mr. Stone had immediately told Phoenix of his discovery of what turned out to be a gigantic larceny and embezzlement on September 23, 1970, and thereafter John Smeritt, the claims adjuster for Phoenix, called on Mr. Stone to discuss the claim of the Russell Company. Smeritt at once told Mr. Stone that he felt this was not a valid claim that would fall within the province of the bond, "because of the speculative nature and the basis which would be highly conjectural!"

Smeritt at the time denied that the insurance company would have any liability. Stone then told Smeritt that the Russell Company had already received a settlement offer of $50,000, and Smeritt advised him to accept it and settle with the wrongdoers. Smeritt told McCormick, Phoenix' home office examiner, that he regarded the Russell Company's claim as worthless and that the discovery date of the employee dishonesty was being molded to comply with the policy. Smeritt also told Mr. Stone, of the Russell Company, that Russell's loss of profits was due to a general business decline rather than to the activities of Grass— without any suggestion that Grass was innocent of these immens defalcatio. When Stone told Smeritt that Grass had stolen the dies and company records, what attitude did Smeritt, the insurer the business protector of Stone take? He indicated his belief that the Russell

Company had not lost anything, by a challenging inquiry why Stone had not filed a police report,—which sounded more like a defense of the criminals than a safeguard of the Company which Phoenix had insured.

Smeritt's superior, McCormick, drank in everything Smeritt told him, writing him that "We normally take the position in a case of this kind that it involves speculation and conjecture on the part of the insured and as such cannot be proven as a loss. We got to have concrete evidence of a loss based on actual loss figures and not involving some speculative guessing on the part of the insured."

By October 17, 1970, Smeritt had already determined, on the part of The Phoenix Insurance Company, not to pay any portion of the Russell Company's loss, but felt that the best interests of Phoenix "will be served in having the insured complete the Proof of Loss *that will materially aid us in defense of the same in due course.*" (Emphasis supplied.) On that date, October 17, 1970, Smeritt wrote Stone a letter in which proof of loss forms were enclosed and provided instructions. The forms were to be executed by a duly authorized official, as well as notarized; all papers and documents in support of the claim were to be attached; the proof of loss had to be completed in its entirety. In the last line of his letter to Stone, Smeritt specifically told Stone that proof of loss was to be "*within four months after discovery of any occurrence which might give rise to a claim under the policy.*" This was false. The policy did not require this, but rather required that "detailed proof of loss duly sworn to" be filed "within four months after the discovery of loss." Phoenix would pay nothing on the claim of the Russell Gasket Company.

Russell Gasket Company, accordingly, brought an action against Phoenix in the amount of $50,000. Phoenix defended on the ground that Russell had not filed its claim within four months of the discovery of the loss.

Phoenix relied on stipulations in the "General Conditions of the Policy," which provide:

"Upon knowledge or discovery of loss or of an occurrence which may give rise to a claim for loss, the Insured shall: (a) give notice thereof as soon as practicable to the Company or any of its authorized agents . . . (b) file detailed proof of loss, duly sworn to, with the Company within four months after the discovery of loss. . . .

"No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this endorsement nor until ninety days after the required proofs of loss have been filed, nor at all unless commenced within two years from the date when the Insured discovers the loss."

Phoenix claimed that the above provision required filing of the proof of loss within four months of September 10, 1970, the date on which Mr. Stone, the President of the Russell Company, received the first telephone call from Mr. Hammond, informing him that Ed Grass was stealing the valuable records from the Russell Gasket Company for the benefit of Russell's competitor, R.P.I., Inc.

However, under Ohio law, "discovery of loss" does not occur until the insured has had a reasonable time to discover the extent and amount of the loss. The court properly held that Russell had properly filed its loss after "discovery of the loss;" that such filing was timely and not prejudicial to the insurance company; and that "discovery of loss" includes the discovery of the extent and the amount thereof, as nearly as can be ascertained. In Ohio, the law entitles the insured to a reasonable time to discover the *extent* and *amount* of its loss. Wolinsky v. National Casualty Co., 124 Ohio St. 216, 220, 177 N.E. 588, 589.

The admitted loss in this case was extensive, complicated, and difficult of proof, requiring a considerable time for its investigation and ascertainment.

The trial court correctly found as a matter of fact that Phoenix had denied that Russell's losses were covered, and stood idly by while Russell pursued the wrongdoers, and properly held as a matter of law that such conduct constituted an estoppel and waiver of Phoenix' claim that Russell violated Phoenix' alleged subrogation rights. Smeritt, representing Phoenix, not only denied any liability to Russell but did nothing whatever to assist in Russell's claim and, as a result, Phoenix was not even represented by its lawyers in Russell's suit against the tortfeasors. There was no evidence which established any prejudice to Phoenix' alleged rights of subrogation. Right from the beginning, when Russell informed Phoenix of its loss and claim, it is plain that under no circumstances would it help Russell and that *it never intended to protect and assist its insured.*

The case was tried before Judge Robert B. Krupansky and a jury in the Northern District of Ohio, Eastern Division. Subsequent to the opening statements of counsel, it was agreed between the parties that a number of issues, posing primarily questions of law, be withdrawn from the jury and decided by the court. There was a wealth of testimony from both sides. The issues posing primarily questions of law were passed upon by the court. Phoenix had made a motion for a directed verdict, which the court overruled, and the amount of damage to be awarded to Russell Gasket Company was reserved for submission to the jury, which entered its verdict in accordance with the agreement between counsel.

We have carefully reviewed the conclusions of law arrived at by the court and find, in them, no error. Accordingly, the verdict of the jury and the judgment of Judge Krupansky entered thereon are affirmed.