483 F.Supp. 1142 (1980)
FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Plaintiff,
v.
The PRESIDENT AND DIRECTORS OF GEORGETOWN COLLEGE, Defendant.
Civ. A. No. 78-1580.
United States District Court, District of Columbia.
January 7, 1980.
*1143 John A. Whitney, Alexander M. Heron, Pope, Ballard & Loos, Washington, D. C., for plaintiff.
Bruce R. Genderson, Williams & Connolly, Washington, D. C., for defendant.

MEMORANDUM OPINION AND ORDER
AUBREY E. ROBINSON, Jr., District Judge.
Before the Court are Plaintiff's Motion for Summary Judgment and Defendant's Motion for Partial Summary Judgment in an insurance contract action brought by the Fidelity and Deposit Company of Maryland (Fidelity) against the President and Directors of Georgetown College (Georgetown). Jurisdiction is based upon 28 U.S.C. § 1332.

I. The Facts

On October 8, 1974, Plaintiff issued a Blanket Crime Policy to the Defendant as the insured. This policy insured Georgetown for up to $500,000 against the loss of money, securities, or other property sustained as a result of the dishonest or fraudulent acts of any Georgetown employee. The bond provides, inter alia, that
LOSS  NOTICE  PROOF  ACTION AGAINST COMPANY
SECTION 8: Upon knowledge or discovery of loss or an occurrence which may give rise to a claim for loss, the Insured shall: (a) give notice thereof as soon as practicable to the Company or any of its authorized agents and . . (b) file detailed proof of loss, duly sworn to, with the Company within four months after discovery of loss . . . No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all terms of this Policy, nor until 90 days after the required proofs of loss have been filed with the Company, nor at all unless commenced within two years from the date when the Insured discovers the loss. . . .
The Blanket Crime Policy was prepared by Fidelity, and Fidelity is responsible for the language used in Section 8.
In 1971 and 1972 Defendant was awarded a contract and a grant (grants) by the National Institutes of Health (NIH) to study hypertension. Dr. Frank Finnerty, Jr., a Georgetown faculty member, was the principal investigator of the grants until his resignation on August 1, 1976. Research pursuant to those grants was conducted in the Georgetown Clinic at D. C. General Hospital. Defendant used certain facilities at the hospital pursuant to an affiliation agreement. Other hypertension studies conducted at the Clinic were funded by the federal government and private pharmaceutical companies.
On January 23, 1976, Mr. Michael Constantine, the Director of the Office of Internal Audit and Management Analysis of *1144 Georgetown University, was visited by a representative of the Federal Bureau of Investigation and an investigator employed by the NIH. During the course of that meeting, the representatives of the FBI and NIH informed Mr. Constantine that they were investigating certain allegations of improprieties committed by Dr. Finnerty, related to the contract between Georgetown University and the NIH.
The substance of the allegations was that the salaries of certain employees being paid by Georgetown were being charged to NIH on that contract when those employees were not doing any work on the NIH contract or were working only part time on that contract. It was alleged that those employees were actually working on research being conducted for private pharmaceutical companies by Dr. Finnerty under contracts between the drug companies and Hypertension Research Associates, Inc. (HRAI), a District of Columbia corporation controlled by Dr. Finnerty's wife, Frances Caputo Finnerty.
In March of 1976 in the course of his investigation, Mr. Constantine wrote to various pharmaceutical companies with which Dr. Finnerty had contracts and requested information with respect to payments made by those pharmaceutical companies to Dr. Finnerty. The information about which drug companies Dr. Finnerty was working for was initially supplied to the defendant by Dr. Finnerty's attorney in March, 1976.
In April 1976 Mr. Constantine interviewed approximately 20 employees of the defendant who were working for Dr. Finnerty on these various contracts. These employees were under the direct supervision of Dr. Finnerty. The salaries of the employees who were paid by Georgetown were charged in whole or in part to the NIH contract.
Included among those interviewed was Dr. William Mroczek, Dr. Finnerty's principal assistant at the clinic. Dr. Mroczek told Mr. Constantine that while his time was being charged to the contract between Georgetown University and the National Institutes of Health, he was not in fact working on the NIH contract. One other employee told Mr. Constantine that either Dr. Finnerty or Frances Caputo Finnerty told her to take the day off when NIH auditors or investigators were scheduled to visit the clinic. Also, Dr. Mroczek told Mr. Constantine that Dr. Finnerty told him to familiarize himself with the NIH contract requirements before the NIH auditors or investigators were to come around.
On May 12, 1976, Mr. Constantine wrote to Mr. Samuel Browne, the Director of the Office of Insurance of Georgetown University, and indicated that he had reason to believe Dr. Finnerty had diverted revenues from Georgetown University to Hypertension Research Associates, Inc. HRAI had hired Dr. Finnerty as a consultant. Frances Caputo Finnerty, owner of HRAI was also an employee of the Defendant who worked at the clinic.
On May 18, 1976, Mr. Browne wrote to Mr. Rock, Georgetown's insurance agent, and notified him of "a possible Fidelity loss." Mr. Browne enclosed a copy of Mr. Constantine's May 12 letter. Mr. Rock forwarded this correspondence to Mr. Robert Mansfield of Fidelity in a letter dated May 21, 1976. Fidelity acknowledged receiving "notice of a potential Fidelity loss" in a letter dated June 1, 1976, from William D. Anderson of Fidelity to Mr. Rock. Mr. Anderson enclosed "Proof of Loss" forms which he requested Georgetown to complete and return.
In a letter dated June 15, 1976, Mr. Browne informed Mr. Rock that because the investigation was not complete, Georgetown was unable to submit a final Proof of Loss to Fidelity. Mr. Browne suggested that Fidelity arrange a meeting with representatives from Georgetown to discuss the matter. Mr. Rock forwarded this letter to Fidelity in a letter dated June 21, 1976.
On July 23, 1976, Dennis Pisarcek of Fidelity went to Georgetown to discuss the Finnerty Investigations. Mr. Constantine disclosed to Mr. Pisarcek what his investigation had revealed and told him that this was a complicated matter with many questions remaining unanswered. While his investigation *1145 had revealed that funds were diverted, Constantine stated that because several studies of hypertension were being conducted simultaneously at the Clinic, it was extremely difficult to precisely reconstruct what resources were being used in a particular study. Mr. Constantine made available all of his files regarding the Finnerty matter. Mr. Pisarcek requested copies of some of the documents which were forwarded to him by Mr. Browne. At no time was the filing of a "Proof of Loss" discussed. Defendant assumed that it could not file such proof until it ascertained what the loss was; this assumption was not told to Fidelity, and they did not request a "Proof of Loss" subsequent to the June 1 letter.
On September 28, 1976, Messrs. Browne, Rock, and Constantine of Georgetown attended a meeting in Baltimore with Messrs. Fitzgerald, Heckathorn, Killam, and Mansfield of Fidelity. The purpose of the meeting was to discuss Fidelity's intention to cancel Georgetown's Fidelity Policy and to consider the possibility of reissuing a new fidelity bond which would be satisfactory to Fidelity. During the course of this meeting, it was suggested that a new policy in which premiums were based on the loss record of Georgetown would be acceptable to Fidelity. Mr. Rock was concerned that the filing of a claim by Georgetown in the Finnerty matter might trigger a higher premium under such a policy, and it was agreed by Fidelity's representatives that any claim regarding the potential Finnerty loss would be filed under the Blanket Crime Policy and would not affect the new policy.
In February, 1977, Mr. Rock received a letter from Mr. Heckathorn of Fidelity regarding the new fidelity bond which ultimately replaced the Blanket Crime Policy. In this letter, Mr. Heckathorn referred to the Finnerty matter as "the pending claim."
In March, 1977, Mr. Rock received a letter from Mr. Heckathorn of Fidelity dated March 21, 1977, which requested that Mr. Rock keep Fidelity "advised on the activity of the Finnerty Loss." The facts reflect that Mr. Rock had numerous conversations with representatives from Fidelity regarding the status of the Finnerty matter.
On March 3, 1977, Georgetown University received from NIH an analysis of the details of the loss which stated that as a result of the activities of Dr. Finnerty and the improper charges for employees and service, NIH had determined that there were improper charges to the NIH contract in the amount of $542,929.70.
On December 20, 1977, Georgetown University filed suit in the Superior Court of the District of Columbia in a case styled The President and Directors of Georgetown College for Georgetown University v. Dr. Frank A. Finnerty, Frances M. Caputo Finnerty, and Hypertension Research Associates, Inc., Civil Action No. 12554-77, alleging fraud, conspiracy, negligence, breach of fiduciary duty, conversion and breach of contract. The suit sought compensatory and punitive damages. It includes a claim for $450,000 compensatory damages as a result of Dr. Finnerty's allegedly fraudulent representation as to salaries charged to the NIH contract.
On February 1, 1978, NIH issued comments on Defendant's reply to its report of March 3, 1977. That report shows total fiscal exceptions assessed against the Defendant of $531,989.78. The exceptions are based upon the same reasons as set forth in the NIH audit report of March 3, 1977, though credits in the amount of $10,939.92 are allowed to the Defendant.
On May 26, 1978, Mr. Browne wrote to Mr. Rock advising him that Georgetown expected to receive a letter from NIH within the next week to ten days stating the findings of the NIH contracting officer regarding the activities of Dr. Finnerty and that Georgetown expected NIH to file for the first time a formal claim against the University for an amount in excess of Five Hundred Thousand Dollars ($500,000) representing costs which, according to NIH, were improperly charged to the government research contract awarded to Georgetown and supervised by Dr. Finnerty.
In early June, 1978, Georgetown received a formal "demand letter" from NIH dated May 31, 1978. In a letter dated June 7, *1146 1978, Mr. Browne forwarded a copy of this demand letter to Mr. Rock, who then forwarded Mr. Browne's letter and the enclosure to Fidelity.
In a letter dated June 22, 1978, from William D. Anderson, Assistant Manager and Attorney for Fidelity, to Glen Rock, Fidelity denied Georgetown's claim and refused to release new Proof of Loss forms. The stated reason for this denial was that the filing of Proof of Loss was untimely because more than two years had elapsed since discovery of the loss.
On July 12, 1978, Mr. Browne forwarded to Mr. Rock Georgetown's Proof of Loss with supporting documents which were then forwarded to Plaintiff. Fidelity again denied Georgetown's claim in a letter from Mr. Rock dated August 14, 1978. The stated reason for the denial was that Georgetown had "failed to file a Proof of Loss within four months of the discovery of the loss and that more than two years have elapsed since the loss was discovered."
Plaintiff now seeks a declaratory judgment that Georgetown violated the terms of the policy by failing to provide a Proof of Loss within four months of the discovery of the loss, and therefore is not entitled to indemnification under the policy. Defendant has counterclaimed, seeking compensation from Fidelity for its debt to NIH.

II. Analysis

Under well-settled rules of construction, an ambiguous contract "should be construed less favorably to that party which selected the contractual language." United States v. Seckinger, 397 U.S. 203, 216, 90 S.Ct. 880, 888, 25 L.Ed.2d 224 (1970). This canon of construction has been vigorously applied in insurance cases. See Imperial Insurance, Inc. v. Employers Liability Assurance Co., 143 U.S.App.D.C. 173, 442 F.2d 1197, 1199 (D.C. Cir. 1970). There, the Court specifically found that a provision identical to Section 8 of the Contract in the instant case was ambiguous. Id., 143 U.S. App.D.C. at 174, 442 F.2d at 1200.
The most reasonable interpretation of the first paragraph of Section 8 is that notice must be given upon either (1) discovery of loss or (2) discovery of an occurrence which may give rise to a claim for loss. Proof of Loss, however, need only be filed within four months of the discovery of loss and not within four months of the discovery of an occurrence which may give rise to a claim for loss. See Russell Gasket Co. v. Phoenix of Hartford Ins. Co., 512 F.2d 205, 508 (6th Cir. 1975). That Court, in evaluating a clause identical to Section 8, held that discovery of the loss in complex matters may not occur for several years after an occurrence giving rise to a claim. Id., at 207-208.
The facts demonstrate that in May 1976, Georgetown gave notice of the "discovery of . . . an occurrence which may give rise to a claim for loss" and not of the "discovery of loss." Mr. Browne's letter of May 18, 1976, referred to a "possible Fidelity loss." Fidelity, by its own admission, acknowledged in its letter to Glen Rock dated June 1, 1976, that it had received "notice of a potential Fidelity loss." Thus, both parties contemplated that the June 18, 1976, notice by Mr. Browne constituted notice of a possible loss and not of an actual loss which would give rise to the Proof of Loss requirement.
To ascertain whether Georgetown filed a timely Proof of Loss on July 12, 1978, two issues must be resolved by the Court, to wit: (1) what is the loss that Defendants seek indemnification for, and (2) when was this loss discovered within the meaning of Section 8. Georgetown suffered two types of losses due to the alleged fraudulent behavior of its employees; direct loss and third party loss. Direct monetary losses resulted from the diversion of monies paid by pharmaceutical companies for research and from the misuse of Georgetown's facilities. A third party loss resulted from Finnerty's exploitation of the NIH grants. The erroneous billing of employees' salaries to the NIH grants did not directly harm Georgetown. No money was embezzled from the University. Defendant's detriment would only occur when and if NIH *1147 demanded compensation from the University for the embezzlement.
Fidelity contends that a "loss" refers to a transaction or series of transactions causing detriment to the insured. Thus, all losses in this case would derive directly from Finnerty's actions, and discovery of these losses would occur when Georgetown had knowledge of them. This definition of discovery of loss is contrary to both logic and law. A loss is not a transaction itself, but the result of that transaction. Only when the result of a transaction is known is the loss discovered. See Russell Gasket Co. v. Phoenix of Hartford Ins. Co., supra, at 208.
In the instant case, the distinction between direct and third party losses is important. An insured is not covered under the policy for possible losses. Rather, a loss must accrue to the insured before he may claim indemnification. In cases where the loss is initially suffered by a third party, but the insured is obligated to compensate that party, the loss does not accrue until the third party demands such compensation from the insured. See Aetna Casualty and Surety Co. v. Guaranty Bank and Trust Co., 370 F.2d 276, 280 (1st Cir. 1966). There was no loss, within the meaning of the insurance contract, until the third party claimed indemnification. The loss could not be discovered until it existed. Id., at 280.
Plaintiff cites many cases supporting the proposition that "`discovery' means that time when the insured gains sufficient factual knowledge, not mere suspicion, which would justify a careful and prudent man in charging another with dishonesty." Alfalfa Electric Coop. Inc. v. Travelers Indemnity Co., 376 F.Supp. 901, 906 (W.D.Okl. 1973). Plaintiff extrapolates from this that (1) in May of 1976 Defendants had met this standard, (2) the loss was therefore "discovered" in 1976, and (3) Defendants have failed to meet the Section 8 requirements. None of the cases cited by Plaintiff involves a third party loss. Moreover, all of those cases involved a discovery clause tied to a notice provision. The Courts in those cases were ascertaining the extent criminal behavior must be known before notice is given to the insurer. Since timely notice was given in the instant case, and no loss existed until there was a third party demand for indemnification, Plaintiff's allegations must fail.
The undisputed facts indicate that Defendant timely filed, and Plaintiff accepted, notice of an occurrence which might give rise to a claim for loss. Defendant and Plaintiff were in constant contact regarding this occurrence, but the complexities of the case, including the third party loss, precluded Defendant from filing Proof of Loss. As soon as NIH, the third party, demanded compensation from Georgetown, Defendant filed the Proof of Loss. As a matter of law, Defendant's filing was timely. There is no evidence of record, nor is it alleged by Plaintiff, that Defendant is in violation of any other term of the contract.
It is therefore by the Court this 7th day of January, 1980.
ORDERED, that Defendant's Motion for Partial Summary Judgment be and hereby is GRANTED; and it is
FURTHER ORDERED, that Plaintiff's Motion for Summary Judgment be and hereby is DENIED.