**MISSISSIPPI POWER & LIGHT COMPANY, Plaintiff,**

**Mississippi Public Service Commission, Plaintiff–Intervenor**

v.

**UNITED GAS PIPE LINE COMPANY, Defendant.**

Civ. A. J86–0732(L).

United States District Court,
S.D. Mississippi,
Jackson Division.

Dec. 13, 1989.

Joseph P. Wise, Thomas G. Lilly, David W. Clark and Mark P. Caraway, Wise, Carter, Child & Caraway, Jackson, for plaintiff.

Richard W. Wise, Dennis W. Miller, Miss. Public Service Com'n, Jackson, for plaintiff-intervenor.

John R. Hutcherson, R. David Kaufman and Brooks Eason, Brunini, Grantham, Grower & Hewes, Jackson, for defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

*Introduction*

This diversity action arises out of an agreement entered into between plaintiff, United Gas Pipe Line Company (United), and defendant, Mississippi Power and Light Company (MP & L). Presently before the court are the cross motions of United and MP & L for partial summary judgment on count III of United's counterclaim. Each party has responded to the motion of the opposing party, and the court has considered the memoranda with attachments submitted by the parties in ruling on the motion.

*Parties and Facts*

MP & L is a public utility which generates, transmits and distributes electricity, principally in the western half of the state of Mississippi. United is an interstate pipeline company with pipeline systems in Texas, Louisiana, Mississippi, Alabama and Florida. On December 8, 1967, MP & L and United entered into a Gas Sales Agreement (the agreement) providing for the purchase of large volumes of natural gas by MP & L from United over a 25–year period. Article XIV of the agreement as amended on April 29, 1969 provided that the price to be paid by MP & L to United for the gas would be calculated by adjusting various base rates (which varied with

the amount of gas purchased) according to the "weighted average purchase price" of gas which United purchased in certain geographic areas. This weighted average purchase price was to be based upon "the cost of gas purchased" by United, with "cost" specifically defined as "the amount payable by Seller [United] to the producer, pipeline, or other seller," subject to certain other contract provisions.[1]

Count III of United's counterclaim represents an attempt by United to recover certain charges for gas delivered to MP & L between March 1979 and January 1985. Although MP & L paid the original invoices for these deliveries, subsequent rulings by the Federal Energy Regulatory Commission (FERC) allowed United's producers to charge additional amounts for gas, thereby increasing the cost of this gas to United and, according to United, increasing the amount MP & L became obligated to pay United under the agreement. On July 30, 1987, United invoiced MP & L for these retroactive cost adjustments in the amount of $4,635,899.38. MP & L refused and continues to refuse to pay these charges, contending that they are not due because United, pursuant to a settlement agreement and release dated September 25, 1985, has released any claim it may have had against MP & L for these charges. Alternatively, MP & L contends that the gas purchase agreement prohibits United from including these charges in its calculation of the cost of gas. Because the court concludes that the September 25, 1985 release is dispositive of the issues raised in the motions, it will not address this latter argument.[2]

*Regulatory Framework*

In 1978 Congress passed the Natural Gas Policy Act, 15 U.S.C. § 3301 *et seq.* (1982 & Supp.1989), which established ceiling prices for first sales of natural gas.[3] Section 110 of the Act, 15 U.S.C. § 3320, however, set forth an exception, providing that

1. Only one of these provisions has any relevance to the present dispute. *See infra* note 6.

2. *See infra* note 6.

3. The Act defines a "first sale" in 15 U.S.C. § 3301(21). Ordinarily, the first sale is the sale by the natural gas producer to the pipeline company.

a higher price would not violate the maximum lawful price if the amount exceeding the ceiling price was for the recovery of certain production-related costs borne by the seller of the gas, and if FERC, in its discretion, chose, by rule or order, to allow such costs.[4] FERC subsequently issued a series of orders which created a scheme of allowances permitting producers to recover certain production-related costs.[5]

According to United, it began paying current Order 94 costs to producers from whom it purchased gas and began passing these costs on to its customers, including MP & L, on January 1, 1985. United paid the retroactive Order 94 amounts due producers—approximately $112 million—on September 30, 1985. United's July 30, 1987 invoice to MP & L represents United's calculation of MP & L's share of these retroactive costs.

### The September 25, 1985 Release

The release relied upon by MP & L arose out of two separate lawsuits between United and MP & L. The first of these was a suit brought by MP & L in 1974 for damages and other relief resulting from the alleged curtailment by United of deliveries of natural gas under the Gas Purchase Agreement. While this first suit was pending, MP & L brought a second action, alleging improper billings on the part of United under the agreement. In this second suit United counterclaimed for breach of MP & L's minimum purchase obligations. On September 25, 1985, the parties executed a

**4.** Specifically, the Act gave FERC authority to allow recovery for "any costs of compressing, gathering, processing, treating, liquefying, or transporting ... natural gas." 15 U.S.C. § 3320.

**5.** In December 1978 FERC implemented section 110 with interim regulations establishing an application procedure whereby producers could apply to FERC for permission to charge for certain production-related costs. Interim Regulations Implementing the Natural Gas Policy Act of 1978, 43 Fed. 56,536 (1978).

After a period of notice and comment, FERC issued the interim rule, Order 94, 45 Fed.Reg. 53,115 (1980). Pursuant to Order 94, producers could apply to FERC to recover the costs of transporting (other than gathering), liquefying, processing, treating and conditioning gas, as well as other similar costs. Automatic allowances could be recovered for the costs of area gathering and delivery of gas from offshore to onshore. Order 94 also suspended the application procedure for recovering the costs of gathering and compression, in order to establish industry-wide generic allowances for these costs, providing that these allowances, when established, would be effective retroactively as of July 25, 1980, the date of Order 94.

This scheme remained in effect until FERC, by Orders 94–A, 48 Fed.Reg. 5178 (1983), and 94–B, 48 Fed.Reg. 5190 (1983), eliminated the application procedure and replaced it with a system of automatic allowances. Order 94–A also limited recovery to costs for delivery, compression, treatment, liquefaction and conditioning. Although this system of allowances was to become effective as of March 7, 1983, Order 94–A provided that producers could collect retroactively from their purchasers the costs for delivery and compression of natural gas incurred prior to that date.

The substance of the subsequent Series 94 and related orders may be briefly stated. Orders 94–C, 48 Fed.Reg. 24,039, (May 31, 1983), and 94–D, 48 Fed.Reg. 24,051 (May 31, 1983), denied rehearing of Orders 94–A and 94–B, respectively. Order 94–F, 50 Fed.Reg. 31,347 (1985), addressed the timing and manner of payments. Previously, in Order 399, 49 Fed.Reg. 37,735 (1984), FERC had directed producers to refund purchasers for overcharges made because of an improper method of calculating the cost of natural gas. In Order 399–A, 49 Fed.Reg. 46,353 (1984), FERC announced that producers could offset these refunds against the Order 94 production-related charges recoverable from their purchasers. However, this offset procedure was overturned in *Interstate Natural Gas Association of America v. Federal Energy Regulatory Commission,* 756 F.2d 166 (D.C.Cir.), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 115 (1985). In response, FERC issued Order 94–F, which stated that pipelines could have additional time in which to pay undisputed and uncontested Order 94 charges. FERC Order 334, 48 Fed.Reg. 44,507 (1983), established the amounts of the allowances for Order 94–A services and made the interim rule final. The final order in the Order 94 series, 94–G, 50 Fed.Reg. 40,359 (1985), was issued on September 27, 1985. It clarified the meaning of the terms "undisputed" and "uncontested" as used in Order 94–F by explaining that these terms referred to charges that pipelines had previously agreed with their producers to offset against refunds due the pipelines from the producers.

The scheme of allowances established in Orders 94, 94–A and 94–B was upheld by the Fifth Circuit in *Texas Eastern Transmission Corp. v. Federal Energy Regulatory Commission,* 769 F.2d 1053 (5th Cir.1985), *cert. denied,* 476 U.S. 1114, 106 S.Ct. 1967, 90 L.Ed.2d 652 (1986). The current regulations as amended may be found at 18 C.F.R. § 271.1100 *et seq.* (1989).

settlement agreement and mutual releases, dismissing both suits. The release signed by United states in pertinent part as follows:

> ... United fully, finally, and forever waives, releases and discharges MP & L and all directors, officers, and employees (in each case past, present or future of any thereof) from any and all obligations, demands, rights, remedies, claims, other action, damages, losses, suits, common law, statutory or constitutional causes of action, costs, judgments, penalties, liens, and executions, which United has or ever may have arising out of, relating to, based upon or in any way connected with MP & L's obligations under the Contract, including any obligations, demands, rights, claims, right of action or remedies for breach of contract or tort or any nonperformance or other action or failure to act by MP & L, whether known or hereafter discovered, and whether or not asserted or unasserted, *which obligations, demands, rights, claims, rights of action or remedies arose at any time or times prior to the Settlement Date* and whether arising under the Contract or any common or civil law or in equity or created by any code, rule of law, regulatory order, rule or regulation or statute, constitution or otherwise; provided, however, that United does not release any claim for payment of its statement rendered to MP & L dated September 10, 1985 or any claim for payment of the purchase price of any natural gas delivered to MP & L by United under the Contract from September 1, 1985, to the Settlement Date (emphasis added).

 MP & L contends that the release is unambiguous on its face and operates to release MP & L from any obligation it may have had to reimburse United for retroactive Order 94 costs.[6] United, on the other hand, argues that the release clearly applies only to claims which arose before the settlement date, and that United's claim for retroactive Order 94 costs arose after this date. United also contends that evidence of the parties' actions after the date of the release conclusively establishes that it was their understanding that this claim had not been released.

United takes a very restrictive view of the meaning of the word "arose" as used in the release, arguing for a meaning akin to that which it would have in a statute of limitations context. United argues that only after United had sent MP & L an invoice for these charges, and the ten days which MP & L had under the agreement during which to forward payment had passed, would United have had a claim upon which it could sue. United also points out that it had not yet paid its producers these charges, and thus it did not yet have any right or claim to reimbursement for these costs from MP & L. Finally, United states that its claim for retroactive Order 94 charges was "based upon" all of the Series 94 orders, including Order 94–G, which was not issued until September 27, 1985—two days after the settlement, and thus its claim did not arise until after the settlement date.

None of these arguments persuades the court that United's right or claim to payment from MP & L had not yet arisen, for purposes of the release, as of the date of the settlement. United's reliance on the meaning of "arise" in the statute of limitations context is misplaced. The terms used in the release—"obligations, demands, rights, claims, right of action, remedies"—clearly evidence an intent to cover something broader than a mere cause of action. In *Bolling Federal Credit Union v. Cumis Insurance Society*, 475 A.2d 382 (D.C. 1984), the court rejected an almost identical argument, indicating that whether a claim exists at the time of execution of a general release, for purposes of determining whether that claim has been released, is a very

---

6. MP & L's alternative argument is that United never had any claim at all for recovery of these costs because they represented payments by United for special services, which, according to MP & L, are disallowed under the agreement. While the court assumes for purposes of this opinion that United had a claim or right under the agreement to recover retroactive Order 94 charges from MP & L, the court makes no finding or conclusion on this issue. Rather, the court concludes only that any right United *may* have had was waived.

different question from whether a claim exists in the statute of limitations context. *Id.* at 386. This is so because the issue in the release situation is voluntary waiver of a claim, and the critical inquiry is whether the claim or right can be said to exist such that a party is capable of waiving it or preserving it. *See id.* Similarly, in *Johnson, Drake and Piper, Inc. v. United States,* 531 F.2d 1037, 209 Ct.Cl. 313 (Ct.Cl. 1976), the plaintiff argued that a release of all claims existing as of the date of execution of a general release did not bar claims for damages the amount of which the plaintiff had not yet ascertained and for which plaintiff could therefore not have sued. The court rejected this reasoning, stating as follows:

> Plaintiff gets no help from the rule that a claim does not accrue for the purpose of the beginning of a period of limitations until the damages are ascertainable.... The issue here is not a matter of when a claim for damages not yet fully ascertained is barred by the passage of time, but whether a claimant "had" or possessed a claim, sufficiently to reserve it from a general release, at a time when all the damages had not yet been ascertained. The rule for releases is that absent special vitiating circumstances, a general release bars claims based upon events occurring prior to the date of the release.... And no exception to this rule should be implied for a claim whose facts were well enough known for the maker of the release to frame a general description of it and request an explicit reservation.

*Id.* at 1047 (citations omitted).

■ Under this test, it is clear that United's claim arose prior to the settlement date, as it certainly "existed" in the sense that United could easily have preserved it.

On September 25, 1985, the regulatory scheme for recovery of production-related allowances had been in place nearly two years. Although United argues otherwise, it is clear that all the FERC regulations upon which United's claim was "based" were already in effect. The last order in the 94 series, Order 94–G, which was not issued until September 27, 1985, dealt only with clarifying the meaning of two terms used in a previous order.[7] United makes no attempt to indicate what significance this order had with regard to establishing United's obligation to pay these costs to its producers or United's right to reimbursement from MP & L under the agreement. United, according to its own evidence, had been paying current Order 94 charges and billing its customers for reimbursement of them for nine months.[8] United had been in the process of verifying the amounts it would pay producers in retroactive charges and planned to pay these amounts, or at least a substantial portion of them, within five days after the settlement date, as is evidenced by the following representation made by United in its "Petition ... for Authority to Institute Direct Billing of Retroactive Order No. 94 Costs," which it filed with FERC on September 10, 1985:

> Although United has not paid the retroactive amounts, it has received the required documentation from its producers and is computing and verifying the amounts due the producers. United anticipates that a substantial portion of such costs will be paid by September 30, 1985.

Under these circumstances, it is simply not reasonable that the parties would intend that United's claim for these charges remain viable and yet not include in such a broad release what could so easily have been included—a specific reservation for FERC retroactive Order 94 charges. This

---

7. *See supra* note 5.

8. Under Mississippi law, the meaning and effect of an unambiguous contract are questions of law which may be determined by the court. *Putman v. Ins. Co. of North America,* 673 F.Supp. 171, 175 (N.D.Miss.1987), *aff'd without opinion,* 845 F.2d 1020 (5th Cir.1988); *Dennis v. Searle,* 457 So.2d 941, 945 (Miss.1984). However, in determining the meaning and effect, the court may consider evidence of the situation of the parties and surrounding circumstances at the time of entering into the contract. *See Humble Oil & Refining Co. v. Standard Oil Co. (Ky.),* 229 F.Supp. 586 (S.D.Miss.1964), *rev'd on other grounds,* 363 F.2d 945 (5th Cir.1966), *cert. denied,* 385 U.S. 1007, 87 S.Ct. 714, 17 L.Ed.2d 545 (1967).

conclusion is further supported by the fact that United did include in the release two specific exclusions for payments for gas delivered to MP & L prior to the settlement date. Where a contract contains specific exclusions, it is to be assumed that no others were intended. *Gilchrist Tractor Co. v. Stribling*, 192 So.2d 409, 415 (Miss. 1966).

Neither does the fact that United had not actually paid these charges to its producers at the time of execution of the release compel a contrary result. By September 25, 1985, these charges had clearly become part of the "cost of gas purchased" by United within the meaning of the Gas Sales Agreement. Although not yet actually paid, they were owed by United to the producers and were therefore amounts "payable." [9] It necessarily follows that at that point in time United had a claim or right to payment from MP & L. On that date, MP & L would have been obligated to pay the charges had United requested payment. For these reasons, the court concludes that the only reasonable interpretation of the release is that United's claim against MP & L for retroactive Order 94 charges arose prior to September 25, 1985.

United also makes the more general argument that the parties intended to settle only those claims involved in the two lawsuits, not the retroactive FERC Order 94 claims. It contends that this intent is borne out by evidence that after the date of the release the parties continued to assume that MP & L would pay these charges to United. United has gone to great lengths to present to this court affidavits and depositions which it characterizes as showing conclusively that both parties had such an understanding. It also points to various documents surrounding MP & L's audits of United's billings to MP & L and argues that these documents indicate MP & L's continued acknowledgment of the viability of United's claim after the settlement date. MP & L, in turn, has attempted to show that United's evidence will not support the interpretation urged by United.

The court finds no basis in Mississippi law for considering this evidence. In Mississippi, before a court may consider (or allow a jury to consider) extrinsic evidence of the subjective intent of the parties to a contract, it must conclude that the language of the contract is ambiguous on its face. *See Pfisterer v. Nobel*, 320 So.2d 383, 384 (Miss.1975). A contract is ambiguous if it is susceptible to more than one reasonable meaning. *See Employers Ins. of Wausau v. Trotter Towing Corp.*, 834 F.2d 1206, 1210 (5th Cir.1988). The broad language of the release indicates clearly and unambiguously that the parties intended that United release *all* claims arising prior to the settlement date, not just those involved in the two lawsuits. This is so notwithstanding the fact, upon which United relies, that the sixth "whereas" clause places the settlement and release within the context of the two lawsuits.[10] First, the court finds nothing particularly unusual about a party's releasing all claims arising under a particular contract against another party, even those unrelated to the lawsuit, as a condition to end litigation involving that same contract. Moreover, even were the court to find the language of the "whereas" clause to be in conflict with the terms of the release, the unambiguous language in the substantive portion of the release, which releases all claims under the Gas Sales Agreement, would prevail over it. *See Gulf Oil Corp. v. Fed. Power Comm'n*, 563 F.2d 588, 598 (3d Cir.1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978); 17 Am.Jur.2d *Contracts* § 268 (1964).

Accordingly, because the court concludes that United's claim against MP & L for retroactive FERC Order 94 charges has

---

9. *See* text accompanying note 1.

10. The sixth "whereas" clause of the settlement agreement reads as follows:

WHEREAS, United and MP & L desire to ... settle and compromise as to all parties the aforesaid suit resulting from United's inability or failure to deliver the quantities of gas to MP & L provided for in the Contract, and to settle and compromise all disputes, claims, actions and proceedings now existing in Civil Action No. J83–0267(L) [the audit suit] under the Contract; ....

**510**

been released, plaintiff's motion for partial summary judgment will be granted, defendant's motion denied, and count III of United's counterclaim dismissed.

SO ORDERED.